## Wilcox *et al. v.* Mitchell *et al.*

If the holder of the note knew that the endorser changed his place of residence before its dishonor, notice sent to the place where the party resided when the note was made, is not sufficient.

When the endorsements are separate and distinct, want of notice to a prior endorser, does not discharge the subsequent endorser who had notice. This rule is not affected by the act of 1837, requiring drawers and endorsers to be sued in the same action.

If the exceptions are taken during the trial, and by the consent of the court, and defendant's counsel, and the bill drawn up and signed *nunc pro tunc*, it will be sufficient.

By the act of 1836, justices of the peace are authorised to act as notaries public.

IN error to the circuit court for the county of Hinds.

This action of *assumpsit* was brought by Wilcox and Fearn, under the statute of 1837, jointly against James C. Mitchell, as the maker of a promissory note for $13,033, against Henry Calhoun as first endorser, Mitchell Calhoun second endorser, and A. G. McNutt, third and last endorser.

The defendants pleaded *non assumpsit.* There was a verdict and judgment in favor of the defendants Henry Calhoun and A. G. McNutt, and against the other defendants.

Appeared in proof, upon the trial, that Mitchell Calhoun and McNutt were duly notified of the non-payment of the note, and that notice of protest was sent to Henry Calhoun at Vernon, the place where the note was dated and executed, and where Henry Calhoun resided at the time of the execution of the note.

It was stated in the bill of exceptions of the plaintiffs, that they proved on the trial, that after the execution of the note, the said Henry Calhoun, in the year 1836, removed to and settled in the town of Paulding in the eastern part of this state, which has since been and still is his residence, that he was an attorney at law, and gave notice of his removal and residence in a public print.

At the request of defendants' counsel, the court below gave the following instructions to the jury:

[*Wilcox et al. v. Mitchell et al.*]

1. That it was necessary to prove notice on the endorser where he resided when the notice ought to have been given to him, and that without such notice he is not liable.

2. That if they should be of opinion that proper notice was not given, so as to fix the responsibility on Henry Calhoun, the first endorser, then it would operate as a discharge to defendant McNutt.

3. That the place fixed to a note or bill, does not fix the residence or post office of the endorser.

To which instructions the plaintiffs excepted, and now assigns them for error.

Holt for plaintiffs in error.

The plaintiffs, Wilcox and Fearn, seek a reversal of the judgment rendered in the court below, in favor of McNutt and Henry Calhoun, and they assign for error, the several charges of the court to the jury, which superinduced and resulted in the verdict upon which that judgment was based.

It is believed that the notice to Henry Calhoun was sufficient, and that there should have been a finding against him. It was forwarded to Vernon, Mississippi, the place at which he resided when the note was made and endorsed, and there is no proof in the record showing that plaintiffs had any knowledge of his change of residence. In Bayley on Bills, 283, this doctrine is laid down in these words, "a notice sent to the place where a party to a bill or note resided at the time it was made or taken by the holder, is sufficient, although the party may have removed to another place before the dishonor of the bill or note, if the holder does not know and has no reason to suspect this change of residence."

By proof that notice was sent to Vernon, plaintiffs made out a *prima facie* case, which entitled them to recover, and the *onus* of showing that they had knowledge of the party's change of residence was thrown upon defendants. They utterly failed to trace home upon plaintiffs any such knowledge. Publication in the newspapers was not legal notice, unless there was evidence in the cause, that such publications came to the knowledge of plaintiffs. The charge of the Judge noted in first assignment of errors, is in violation of this principle.

But supposing that the notice to Henry Calhoun (1st endorser) was insufficient, and that a verdict was properly found in his favor, did this discharge McNutt, a subsequent endorser, who was properly notified? McNutt, at the time the note matured, and was protested, resided near Jackson, Mississippi, which was "his post office and place of address." Payment of the note was regularly demanded, and he was duly notified of the protest; but the Judge at the instance of McNutt's counsel, charged the jury "that if they should be of opinion that proper notice was not given, so as to fix the liability of Henry Calhoun, the first endorser, then it will operate as a discharge to defendant, McNutt," and in obedience to this charge, the verdict was returned in his favor. In this charge of the Judge, it is believed, there is manifest error.

The holder of a bill or note which has been protested, may charge any or all of the parties thereto, by proper notification, or he may discharge any or all of them, by neglecting to give such notification. If a party who receives notice is desirous of fixing the liability of those who stand before him on the paper, it is incumbent upon him to give them notice, and to enable him to do so, the law allows him one day for giving such notice, after notice has come to him. Bayley, 263. This familiar doctrine will be found recognised in Edwards *v.* Dick, 4 Barnwell and Alderson, 212. 6 Eng. C. Law Rep. 405–6, and in Bayley on Bills, 249, where it is emphatically laid down, "that although the holder may have omitted notice to some of the parties, that will be no protection to such as are duly notified." At page 290 of same work it is said, "the neglect of the holder of a bill or note to notify any parties to it, will not discharge any other party whom he has duly notified." State Bank *v.* Hennan, 16 Martin, 226. I presume it will be conceded that this is the common law rule.

The only question remaining, is, whether the statute of May, 1837, commonly called the "McNutt law," has changed the common law rule? I think it has not. Instead of making the contracts of the several endorsers dependent upon each other, it maintains their several and independent character, and authorises "the jury to render a verdict against part of the defendants and in favor of the others, if the evidence before them require such a verdict." It further gives the plaintiff "the right to discontinue his suit

against any one or more of the endorsers or securities that he may sue in any joint action before verdict, *on payment of the costs* that may have accrued by joining said defendant in such suit." The penalty of a discontinuance as to an endorser, is not a loss of the right to proceed against subsequent endorsers, but simply a payment of the costs, which have accrued by joining the party as to whom the discontinuance was entered. The obvious intent of the several provisions of the statute is, that the money shall be collected from the parties *against whom judgment is rendered,* in the order in which those parties stood to each other on the bill or note, and not that the money shall be collected from the parties in the order in which they stood upon the bill or note, whether judgment was obtained against them all or not. The several clauses of the statute must be so construed as to stand together. If the position, for which I contend, be not maintained, the 1st, 3d, 5th, 6th, 8th, and 10th sections of the statute, would be irreconcileable.

It is insisted by the counsel of defendants in error, that even if the charges of the circuit judge to the jury were erroneous, yet that the testimony of plaintiffs did not entitle them to recover, and that therefore the judgment should not be disturbed. This puts in issue the competency, as an instrument of evidence, of the notarial record, upon which the verdict of the jury was found. The record conforms in every particular to the requisitions of the statute of 1833, entitled " an act to amend an act entitled 'an act to regulate the taking of documentary testimony in certain cases, and for other purposes, approved 13th December, 1830.' " This statute was enacted at the first session of the legislature held under the new constitution, and in no manner violates its letter or spirit. The second section of the act declares that such records "shall have the same force, validity, and effect, in all courts of record within this state, as if the notary were personally present and interrogated in court." The statute of 1836 (Laws Miss. 577,) makes justices of the peace *ex officio* notaries public. This court, during the present term, in case of Bernard *v.* Planters' Bank, incidentally recognized the validity of records, made out under the statute of 1833.

[Wilcox *et al. v.* Mitchell *et al.*]

Work, for defendant in error.

The bill of exceptions is not sufficient to entitle the plaintiff in error to be bound in this court, 5 Condensed Reports, 721, Walton *v.* United States; 1 Howard, Patterson and Phillips, 572; Phillips *v.* Lane, opinions January term, 1840, opinion book, p. 586.    9th J. 345, Middlebury *v.* Collins, 9 Petersdorff, 218.

The act approved the 27th February, 1833, late collection of the statutes, page 456, authorising a notary to "*protest*" bills, &c., is abrogated by the new constitution, which abolishes all offices during good behavior, Bryant *v.* The State, 1. H. 355; by the former law, page 263 of the Revised Code, notaries were commissioned by the governor, &c. the old constitution 553, Revised Code, section 12, offices held during good behavior, new constitution, page 18 of Howard and Hutchinson's statutes.    See 30 & 4 section of schedule, page 36 of same; Chitty on bills, 363, side page, a notary is a "*public officer.*"

By the act of 1836, statutes 577, the powers "heretofore" belonging to notaries public, shall vest, &c. in justices of the peace. As it is conceived that the office of notary was abolished by the new constitution, no law having since passed for the election, &c. of a notary, no power is vested in notaries in this state since the new constitution; and if the expression, "heretofore," referred to the power that notaries had in the state immediately before that law, then they had none ; but if it referred to the powers of notaries in this state generally, under the Law Merchant and statutes of this state, then neither had notaries, under the Law Merchant or any former statute of this state, any authority to make their statements on oath, or not on oath, as to where, to whom, when, &c. notice was sent, evidence in a case.    The duty and power of a notary extends to making demand and protesting a foreign bill, and demanding and possibly protesting domestic bills.    He never was allowed to make his certificate, or ex parte affidavit as to the giving of notice, &c.    The act of 1833, which purported to give such powers to notaries, was passed after the new constitution took effect, and was a nullity from its inception, and therefore no such authority as is thereby attempted to be given, ever existed, and the act of 1836, which vested "in justices

of the peace" "powers heretofore belonging to notaries public," and which in the second section provided that all acts of a notarial character done by them, should " receive the same credit and legal importance attached to the acts of notaries public within the United States."

The third section of said act provides that the " justice of the peace shall keep a separate and distinct register of all his acts of a notarial character, and shall when thereto required give a certified copy of any record in his office."

As it is confidently believed that in this state, or in no part of the United States, had notaries public the power to make their notarial certificates, or their *ex parte* affidavits, evidence of the sending of notice, it is concluded that justices of the peace could not, under the act of 1836, have that power, therefore the notarial certificate of E. H. Maxcy, as justice of the peace of Warren county, ought not to have been received in evidence. But it is insisted that if the act of 1833 is in full force, the said notarial certificate or supposed record of Maxcy was illegal in evidence. It is provided, in the second section of that act, " that when any notary public shall protest any such instrument as is described in the foregoing section, he shall make and certify, on oath, a full and true record of what shall have been done thereon by him." The court will bear in mind that if this be a valid law, its provisions are an invasion of the former rules of law, and, may I be permitted to say, they were a dangerous innovation of former rules and rights, for by this law a party was cut off from the invaluable right of cross-examining witnesses. The act should, therefore, be strictly construed.

The notary was required, "when he protested a note," &c. "to make and certify, on oath, a full and true record." The supposed record set out in the bill of exceptions does not appear "to be certified on oath" "when" the note was protested, which was on the 24th of January, 1838; and on the 12th of December, 1838, nearly eleven months thereafter, Mr. Maxcy made oath that the said record contained the truth, to the best of his "knowledge and belief." A record imports absolute verity, and a record which is true or untrue, according to the uncertain " knowledge and belief" of any person, is no record, and so the plaintiffs in

error seem to have considered this, by the attempt to make it better, by an affidavit taken before the " mayor of the city of Vicksburg, for said county," (of Warren,) on the 12th day of June, 1839, a few days before the trial, and nearly a year and a half after the said protest.  By an act, approved the 26th day of February, 1836, session acts of that year, page 335, what was formerly known as the *town* of Vicksburg, was incorporated under the name of the " City of Vicksburg," and extending so far in Warren county only as said town did, which limits are set out by said act.  The citizens had a right to elect a " mayor," &c.— By an act of 1839, (acts of that year, 305,) the inhabitants of the said city are styled " The Mayor and Council of the City of Vicksburg."

No such officer as a " Mayor of the city of Vicksburg, for said county," (Warren, mentioned in the margin,) exists or ever existed, and no such person as mayor of the city of Vicksburg, *for the county of Warren,* had authority to administer an oath, and therefore both supposed affidavits to said supposed record are invalid ; and the circumstance of the " record not appearing to be made on *oath,* " *when*" the note was " protested," but at 11 and 17 months after that time, render the said notarial record inadmissible evidence, even under the act of 1833.   (See bill of exceptions in the record, filed 7th January, 1840, in which the notarial record is copied.)

By the third section of the act of 1836, (copied above,) the justice was required to keep " *a separate and distinct register,*" and " to give a certified *copy* of any *record,*" which shows that these notarial acts are considered as records, and a justice "*should give certified copies on oath,*" and it does not appear from the papers filed that it is a *copy* of any record; for these and other reasons, the notarial record is believed to be illegal evidence ; and yielding for the sake of argument that the judge misdirected the jury, yet if on the whole record judgment ought to have been for the defendant below, (as it must have been if the record had been rejected) it is insisted the judgment will be affirmed, whether there was any motion to reject said record or not in the court below. 4 Monroe, 170, Phelps *v.* Taylor ; 6 Monroe, 285, Clark *v.* Boyd; and 6 do. 606.   Could the legislature by the act of 1836, give to

justices of the peace, which are *judicial officers,* the powers of notaries, which are *executive* officers? .

The powers of government are divided into three bodies of magistracy: executive, legislative, and judicial; and no person or collection of persons being of one of these departments, can exercise powers belonging to the other, &c. sec. 2, article 1, and 2d section New Const. 19. Howard & Hutchinson.

It is believed the court did not err in the instructions given to the jury. The place at which a bill bears date on its face, has been held to authorise the holder to send notice to that place to charge the *drawer, if he did not know of the removal* of the drawer, but it is believed it has never been extended to an endorser of a bill or note. There was proof in this case that Henry Calhoun had removed his residence to Paulding, before the protest, and published his removal in a public paper, from which no doubt the jury inferred the holders of the note knew of the removal of H. Calhoun, and were bound to send him notice to Paulding.

It is supposed no abstract of this case can aid the court. Two records seem to have been filed by the plaintiffs. From the one filed in January, 1840, the court will see the bill of exceptions. It was a suit for a note for more than $13,000 against Mitchell, maker; H. Calhoun, M. Calhoun, and McNutt, endorsers. There was a verdict and judgment against the two first in the court below, and a verdict and judgment for the other endorsers, H. Calhoun and McNutt. The plaintiffs seek to reverse that case so far as the judgment was in favor of H. Calhoun and McNutt.

It does not appear that the notary made the demand within banking hours, and it is proved there were banking hours of that bank. Demand must be made during banking hours. Chitty on bills, top page, 492.

Nicholls *v.* Webb, 5 Cond. Repts. S. C. U. S. 452, shows that it is not the duty of a notary to protest a note, and therefore the act of 1836 giving to justices of the peace the powers of notaries, did not give them the power to protest promissory notes.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The plaintiffs instituted a joint action under the statute of 1837,

against J. C. Mitchell, the maker, and Henry Calhoun, Mitchell Calhoun, and A. G. McNutt, as endorsers of a promissory note. The jury found a verdict against the maker and Mitchell Calhoun, and in favor of the others, and the plaintiffs having taken exceptions to the opinion in charging the jury, now seek a reversal of the judgment.

The record presents two questions made on the trial. 1. The court charged the jury " that the place fixed to a note or bill, does not fix the residence or post office of the endorser, and it is necessary to prove notice on the endorser, where he resided when the notice ought to have been given to him." In the absence of better information, the place named on the bill would be the proper place to send notice, if the actual place of residence could not be ascertained on inquiry; but the fact that a place is named as the place of drawing the bill, is not of itself evidence of the residence of the party. The notice to Henry Calhoun was sent to Vernon, and it was proved that he resided there when the note was made. The law is, that a notice sent to the place where the *party to the note* resided when the note was made, is sufficient, although he may have removed before dishonor of the note, if the holder does not know, and has no reason to suspect the change of residence. Bayley on Bills, 283. It does appear that Calhoun had removed to Paulding, and my reading of the bill of exceptions is, that the plaintiffs, themselves, introduced the proof of this fact. If this be the correct understanding of it, then of course, knowing where he removed to, they should have sent the notice to his new residence.

2. The court charged the jury, that " if they should be of opinion that proper notice was not given, so as to fix the liability of Henry Calhoun, the first endorser, then it will operate as a discharge to defendant McNutt." This charge was erroneous. If they had been joint endorsers, the charge might have been plausible, but their endorsements are separate and distinct. The doctrine seems to be well settled, that the holder of a note or bill may charge any of the parties that he thinks proper, by giving them notice, or he may discharge any one that he chooses, by omitting to give notice. It is certainly advisable that the holder should give notice to all parties, and such notice will enure to the benefit of

[Wilcox *et al. v.* Mitchell *et al.*]

every intermediate endorser who may be entitled to a remedy over against those who stand before him.   If the holder, however, omit to give notice to some of the endorsers, the others are not thereby discharged.   It is the duty of an endorser, when he receives notice, to notify his immediate endorser, or any one on the paper before him, that he may intend to hold liable; and for this purpose he has the same time to give notice that the holder had. Bayley on Bills, 249, 263.   4 Yerger, 265.   Chitty on Bills, 466, 528, 530, 8th Am. Ed.   There is nothing in the statute of 1837, requiring that makers and endorsers shall be sued jointly, which militates against this doctrine.   On the contrary, the third section seems to have been framed in anticipation of such a state of things. But whether such was the case or not, the rights of parties are not so changed as to alter the rules in relation to notice.   The reason for those rules still exists, and so must the rules themselves.

An objection is taken by defendant's counsel to the bill of exceptions, because it was signed after the trial.   It appears that the exceptions were taken and noted at the proper time, and by consent of the court and the defendant's counsel, the bill was drawn up and signed afterwards *nunc pro tunc*.   This is sufficient, and takes it out of the rule established by the authorities cited.

An objection is also taken to the official record of the notary, on the ground that the office was abolished by the new constitution. But the record is certified by a justice of the peace; and by the act of 1836, all the powers heretofore vested in notaries public were vested in the justices of the peace *ex officio*, and they are expressly authorised to act as notaries public.   But this objection, even if it were tenable, does not appear to have been raised in the court below, which was the proper place to make it.

For the error mentioned, the judgment must be reversed and cause remanded, with directions to award a *venire de novo*.